VINCENT MILLER (SBN 291973)
NICK SAGE (SBN 298972)
The Law Offices of Vincent Miller
16255 Ventura Boulevard, Suite 625
Encino, CA 91436
Telephone: (213) 948-5702
Attorney for Plaintiffs Jay Stevens, Briana Ortega, Elijah Ortega, Mariah Ortega, Marissa Ortega

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JAY STEVENS, BRIANA ORTEGA, ELIJAH ORTEGA, MARIAH ORTEGA, and MARISSA ORTEGA,

    Plaintiffs,

v.

COUNTY OF LOS ANGELES, municipal entity; ADAM NELSON, an individual, SHAWN MERRICK, an individual, JUSTIN MASRI, an individual; RICHARD MENDOZA, an individual; DOES 1-10 inclusive,

    Defendants.

CASE NO: 2:24-cv-06054-DSF-JC

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR:**

**DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

**Jury Trial Demanded**

Plaintiffs JAY STEVENS, BRIANA ORTEGA, ELIJAH ORTEGA, and MARIAH ORTEGA, MARISSA ORTEGA and through their undersigned attorneys, hereby pray to this honorable Court for relief and remedy based on the following:

**INTRODUCTION**

1. Plaintiffs are individuals residing in Los Angeles, California. Plaintiff Jay Stevens is African American. The other Plaintiffs are of Latino heritage.

2. At all times mentioned herein, Defendant County of Los Angeles (hereinafter, "Los Angeles County" "Defendant County"), a government agency, is located in Los Angeles County, California. The Los Angeles County Sheriff's Department ("LASD") is a branch of Los Angeles County.

3. LASD has long been plagued by many of its deputies forming "subgroups" at certain stations. Some of these subgroups have morphed into deputy gangs, with the groups regularly depriving residents of their constitutional rights, through excessive force, illegal stops and arrests, planting of evidence, and false police reports. This tolerance and acceptance of deputy gangs by LASD has been a practice and custom in the County which has allowed deputy gangs to flourish for over 50 years without reform or intervention. The Individual Defendants, Sergeant Adam Nelson, and deputies Shawn Merrick, Justin Masri, and Richard Mendoza worked for LASD before being terminated for their membership in the deputy gang, the Indians. Defendants Nelson and Merrick have admitted to having Indians tattoos, and the other individual defendants and doe defendants have been identified as members the Indians gang. LASD has made the admission that the individual defendants' membership in the deputy gang led to their attacks on the Plaintiffs.

4. LASD terminated the 4 individual Defendants precisely because of the role the gang and their employment with LASD played in the incident with the Plaintiffs. That the LASD is holding these individual Defendants accountable for what they did to the Plaintiffs will help protect other residents from being harmed in the future. However, the County's 50-year failure to address the deputy gang problem led to the harm to the Plaintiffs. The County knew that the individual Defendants' gang had been long operating out of the Industry station, and yet, the County did no intervention to stop the gang activity there.

5. The Sheriff's Department has a custom, pattern and practice of allowing and encouraging the use of excessive force by deputy gang members against County residents, as LASD has not historically held deputies accountable for such wrongful conduct. LASD failed to properly supervise their employees as it failed to intervene and take any measures to protect residents.

6. The County's continued inaction, even after it admitted in 2019 that LASD allowed the existence of deputy gangs and that the County must do reform to prevent future harm to deputies and residents – specifically, failure to supervise, investigate and discipline employees in the face of widespread constitutional violations – supports an inference that an unconstitutional custom or practice has been unofficially adopted by the County. Certainly,

1 up until and through the attacks on the Plaintiffs, the County ratified the misconduct of the Indians and other deputy gangs.

7. In 2019, County leaders, including the Board of Supervisors, the Inspector General Max Huntsman, the Civilian Oversight Commission, and other leaders admitted that the County of Los Angeles had been plagued by deputy subgroups and gangs for 50 years, and that the County did not do reform or any type of genuine intervention to curb the harm to residents and employees caused by these deputy gangs. In 2019, County leaders admitted the deputy gangs exist, that they cause excessive force and other violence against residents and other deputies and violate their constitutional rights, and that there is an urgent need for reform. Five years later, there was no reform, as the County has only given lip service, and repeatedly lied in litigation regarding deputy gangs, covering up the issue simply to save the County money, at the expense of their employees' and residents' well-being and safety. As a result of the County's false representations, and failure to police itself, the State Attorney General recently announced that it is forcing the County to reform itself. The Defendant is negotiating a consent decree with the State of California. That consent decree includes the banning and removal of the Indians and other deputy gangs from LASD.

8. In 2023, the County's own Civilian Oversight Commission released a 70-page report condemning the "cancer" of deputy gangs, saying they "create rituals that valorize violence, such as recording all deputy-involved shootings in an official book, celebrating with 'shooting parties,' and authorizing deputies who have shot a community member to add embellishments to their common gang tattoos."

9. Prior to the Indians gang assault of the Plaintiffs, there had been a hotbed of deputy subgroup and gang activity in the LASD Industry Station, where the Indians operated.

10. If the County had truly done reform in 2019 and ended the custom, pattern and practice of deputy gangs depriving citizens of their civil rights, harm would not have come to the Plaintiffs.

11. The individual Defendants at all times in the incident with the Plaintiffs acted under the color of law. In addition to the individual Defendants acting in furtherance of their department

gang, they were armed with their service weapons and identified themselves as cops to the Plaintiffs, shouting "Cops, cops, cops!" at the Plaintiffs.

12. As with the individual Defendants, DOE Defendant deputies are employees of the County, and work as deputies for LASD. The Deputies belong to the LASD deputy subgroup, the Indians, and have the Indians gang tattoos on their bodies. There are over 60 members in this deputy gang/subgroup.

13. On February 28, 2022, Plaintiffs, all of whom but Brianna Ortega were teenagers at the time, went to bowl at Bowlium Lanes in the City of Montclair. After they were done bowling, they went out to their two cars.

14. Unfortunately, the deputy gang the Indians, including the individual defendants and the DOE Defendants, were also at the venue. It is alleged upon information and belief that Nelson and his group of deputies decided to bully Plaintiffs because as minority teenagers they looked vulnerable. The deputies initiated the interaction with the teenagers as they walked past the Plaintiffs and pushed open one of the doors to one of the Plaintiffs' cars as one of the teenagers was trying to close it.

15. The Plaintiffs were intimidated by the group of cops, terrified of being assaulted by a gang of adult men. This intimidation encouraged the deputy gang to escalate their confrontation with the Plaintiffs. The teenagers were terrified at all times during the encounter with the deputies, with some of the teens crying, as all of them asked the deputies to stop the assault. The Deputies fed off the intimidation and crying by the teenagers. The deputy gang appeared to be thrilled by intentionally causing the Plaintiffs to be severely stressed and fearful of their lives and safety.

16. The Defendant deputies terrified the teenagers as Defendant Merrick flashed his LASD handgun, the deputies mocked the teenagers, and screamed obscenities at them, including racist comments and homosexual slurs. A dozen or so cops got into the teens' faces, threatening to batter them, with Merrick swinging a car door several times to violently shake the car, before slamming the car door shut. Several of the deputies fixated on the African American teenager in the group, Plaintiff Jay Stevens.

17. Defendants Merrick and Nelson made blatantly racist statements and called Plaintiff Stevens a monkey and the "n" word, and also called the teens homosexual slurs. Defendant Masri punched Stevens hard in the face, and several of the other deputies immediately grabbed Stevens to make sure he wouldn't be able to defend himself. This was a one-sided attack on innocent victims and not in any way a two-way fight. The Defendant deputies yelled "cops, cops, cops!" at the Plaintiffs, to identify themselves, using their authority to intimidate them. While the individual Defendants may have been technically "off-duty" during the incident, they were at all times acting under the color of law, with their deputy firearms, deputy gang tattoos and identification of themselves as cops.

18. The teenagers ultimately escaped from the cops driving their cars away from the venue. The deputies laughed at the teenagers as they drove off.

19. After the teenagers escaped the cops, the deputies did not report the violent assaults to their supervisors, hiding what they had done. Plaintiffs were too frightened of the men to report it initially. However, a witness reported the attack to the Montclair Police Department.

20. Some of the perpetrating deputies then lied to the Montclair Police about the encounter, their racist statements, and the assaults on Plaintiffs, even though video from the bowling alley showed they were lying. The police report is a false and inaccurate one and is mostly based on lies by Defendants.

21. The deputy Defendants sought to further intimate the victims into not reporting the incident. Defendants tried to get Plaintiff Brianna Ortega's phone number, to call her and intimidate her. Defendants used the Montclair Police Department to try to get the phone number.

22. LASD investigated the matter, the deputy gang behind it, and the perpetrating deputies. Defendant deputies lied to investigators, including that their deputy gang tattoo represented "work ethic."

23. Notably, LASD did not ever bring in the victims to LASD to do Internal Affairs Bureau ("IAB") interviews with them. This demonstrates that the investigation was not an objective and thorough investigation. LASD also failed to do a thorough investigation into the subgroup/gang, to identify the other members of the Indians.

24. The County knew about the Indians gang long before this incident with the Plaintiffs. If the County had intervened and dismantled the Indians gang prior to the gang's interaction with the Plaintiffs, and changed the customs and practices in the department, the harms to the Plaintiffs would not have occurred.

25. Sheriff Robert Luna announced he was shocked by the deputies' "outrageous" behavior and conduct toward the Plaintiffs and terminated the deputies for what they did to Plaintiffs, through their affiliation to the deputy gang. LASD fired four of the deputies who attacked Plaintiffs and disciplined several others.

26. In response to a report on the Indians' attack on Plaintiffs, a 2024 motion by Los Angeles County Supervisor Hilda Solis requested that the sheriff compile a report about the Industry Indians, including when the group formed, what other misconduct it has been linked to, and any warning signs of gang activity at the station. The motion also asked for an update on a stronger anti-gang policy. Again, this is great this was done after the incident with the Plaintiffs to protect residents in the future, but this should have been done prior to the attacks on the Plaintiffs. In fact, in 2018, a deputy working at the Industry Station reported illegal conduct at the station, with members of the Indians engaging in illegal conduct towards residents, including planting evidence. Instead of the County fixing the problem at that time, it retaliated against the deputy, placing him under IAB investigation, and forcing him to quit his job.

27. This Board of Supervisors' 2024 motion was reminiscent of several made by the Supervisors dating back to 2019 regarding the deputy gang, the Banditos, operating out of LASD's East Los Angeles Station, and other deputy gangs. Given the County has only given lip service to addressing its most gang-like deputy subgroup, the Banditos, demonstrates the customs and practices of deputy subgroups assaulting other residents and deputies continued up until the assault on Plaintiffs in 2022, and continues moving forward. Thus, more residents like Plaintiffs here will be assaulted by deputy gang members with their constitutional rights violated by the County.

28. The County's failure to address deputy gangs, and their attacks on Latino and African American residents and employees, with the County leaders' five years of hollow calls for reform, caused the harm to Plaintiffs and violation of their constitutional rights.

29. Defendants assault of Plaintiffs has caused severe stress and PTSD, traumatized them to the point of being terrified of the police, having nightmares and scared to being around deputies. Plaintiffs are scared the deputy gang will hunt them down and retaliate against them for reporting the assaults. Plaintiffs are aware that the County won't do anything to protect them. It should be noted that one of the victims of the Indians in the incident did not join this lawsuit out of that fear of retaliation. He is scared that he will be killed if his name is on this lawsuit.

30. The Defendant County violated its own internal procedures by using unreasonable force, while the Indians were acting under the color of law, and as members of the department, through their membership in the deputy gang. Section 3-10/030.00 – Unreasonable Force: Department members shall use only that force which is objectively reasonable. Unreasonable force is that force that is unnecessary or excessive given the totality of the circumstances presented to Department members at the time the force is applied. Department members shall use only that force which is objectively reasonable. Unreasonable force is prohibited. The use of unreasonable force will subject Department members to discipline and/or prosecution. The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of *Graham v. Connor*, 490 U.S. 386 (1989).

31. Given that Plaintiffs, all but one were teenagers at the time, were innocent victims, the force used was blatantly unreasonable and should not have been used at all. Defendants identified themselves as cops to Plaintiffs merely as a means to intimidate Plaintiffs.

32. Plaintiffs are informed, and believe and thereupon allege that Defendant DOES 1-10, and each of them, whether individual, corporate, associate or otherwise, some of which are still unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs will further amend their complaint to show the DOE Defendants true names and capacities, together with appropriate charging language, when such information has been

ascertained. Plaintiffs will file DOE amendments, and/or ask leave of court to amend this Complaint to assert the true names and capacities of these Defendants when they have been ascertained.

33. Plaintiffs are informed and believe, and upon such information and belief, allege that each Defendant designated as a DOE was and is in some manner, negligently, wrongfully, or otherwise responsible and liable to Plaintiffs for the injuries and damages hereinafter alleged and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

34. Plaintiffs are further informed and believe, and thereupon allege, that at all times relevant hereto, Defendants, and each of them, acted in concert and in furtherance of the interests of each other Defendant.

35. At all relevant times, Defendants or their predecessors in office have acted or failed to act, as alleged herein, under the color of state law.

36. The Plaintiffs all exhausted administrative remedies, filing their lawsuit within the statute of limitations.

## JURISDICTION AND VENUE

37. This Court, as well as state court, has jurisdiction over the federal cause of action. The venue is proper because Defendants are located in the County of Los Angeles.

## PARTIES

38. Plaintiffs are individuals residing in Los Angeles. Plaintiff Jay Stevens is African American. Plaintiffs Briana Ortega, Elijah Ortega, Mariah Ortega, and Marissa Ortega are of Latino heritage.

39. Defendant Los Angeles is a municipal entity that operates and operated LASD, which is an agency of the County. The individual Defendants were all County employees and members of the deputy gang the Indians.

40. DOE Defendant deputies are employees of the County, and work as deputies for LASD, and belong to the Indians, which continues to operate out of LASD's Industry Station.

## FIRST CAUSE OF ACTION

## (FOR DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983 AGAINST THE DEFENDANT COUNTY OF LOS ANGELES, ADAM NELSON, SHAWN MERRICK, JUSTIN MASRI, RICHARD MENDOZA AND DOE DEFENDANTS 1-10)

41. Plaintiffs repeat and re-allege as though fully set forth herein each and every allegation, 1-40, contained in the preceding paragraphs of this complaint.

42. The individual Defendants and Doe Defendants are liable for depriving the Plaintiffs of their civil rights for engaging in excessive force against the Plaintiffs, and for failing to intervene to stop the other deputies from engaging in the misconduct. The deputy Defendants acted under the color of state law with malicious intent to deprive the Plaintiffs of their constitutional rights.

43. The County is directly liable for the harms to the Plaintiffs under a Monell claim. Plaintiffs established through the above factual allegations that the County is liable for its customs and practices that led to the Plaintiffs' harms. Plaintiff also established that the County was long aware of the deputy gang problem in general, and the Indians problem specifically, and should have known the harms that would come to the Plaintiffs given LASD's customs and practices of violations of residents' civil rights. In addition, the County cannot rely on claims the Defendants were not on duty as they were armed with their service revolvers, identified themselves to the Plaintiffs as "cops," and were acting in furtherance of their work LASD deputy gang.

44. LASD is a branch of the County, and the County is directly liable for wrongdoing done by LASD as it is the County. Sheriff Alex Villanueva and his associates and prior sheriffs assumed the role of policymakers as the County allows LASD to operate on an "island," without transparency, setting policies and allowing deputy subgroups and gangs to flourish and cause harms to residents, with impunity, as if the deputies are not accountable to the County. County leadership has acknowledged that LASD has been plagued by deputy gangs for over 50 years. However, no reforms have been made to address the deputy gang problem. County leaders allowed LASD to carry on the customs and practices of encouraging and

sanctioning and ratifying the development of deputy gangs, and the harms they caused to residents. County leaders turned a willful blind eye to the deputy gang problem. The County was long aware of the existence and harms being caused to residents by the Indians gang. In 2018, a deputy reported illegal conduct by the Indians gang. However, the County retaliated against the deputy and put him under a rigged IAB investigation for reporting the conduct towards residents. The County failed to intervene and protect residents *prior* to the deputy gang attack on the Plaintiffs.

45. The County knew of the fact that deputy gangs existed at several of its patrol stations as well as in custody, including the individual defendants' gang at the Industry Station, and that these deputy gangs caused harms to residents, engaging in excessive force, planting evidence, and filing false police reports. The County never held any of these deputy gang members responsible for these actions and LASD did nothing to eliminate deputy gangs. Over the decades, when deputies reported misconduct by the deputy gangs, the County simply retaliated against the deputies for reporting. The deputy gang problem, the refusal to hold the gangs accountable, and the retaliation against deputy gang members demonstrates a series of similar acts that reflect customs and practices of the Defendant County.

46. County leadership should have intervened and stopped LASD's customs and practices. The fact that the County turned a willful blind eye to the acts of LASD leadership does not absolve the Defendant of liability. In addition to allowing LASD to have the power to establish practices and customs, the County ratified the misconduct by not intervening and holding LASD leadership responsible and accountable for the deputy gang problem and the harms to residents.

47. As detailed above, the individual Defendants were members of the deputy gang the Indians and were acting in furtherance of its LASD gang when it attacked the Plaintiffs. In addition, at all times during the incident, the individual Defendants acted under the color of law, as they carried their service weapons and informed the Plaintiffs that they were cops. The Defendants yelled at the Plaintiffs that they were "cops, cops, cops!" to intimidate them with their authority, and make it clear they were to not defend themselves. The County cannot

claim it bears no liability based on the acts of these individual defendants being done while they were "off-duty." These deputies were acting as part of the department, more specifically as members of the deputy gang, the Indians, operating out of LASD's Industry Station.

48. The Defendants yelled racist and homophobic statements at the Plaintiffs and called Plaintiff Jay Stevens the "n" word and hit Stevens in the face. Several of the deputy gang members held Steven's arms so he would have to take the punch without being able to defend himself.

49. Given the prior reporting of illegal conduct by the Indians, and the County's long-standing admissions of the deputy gang problem, what happened to the Plaintiffs was predictable. This demonstrates a lack of proper supervision, and intervention to end the wrongful customs and practices of the deputies that led to the harm of the Plaintiffs.

50. Sheriff Robert Luna and his administration has acknowledged for the County that their termination of the individual defendants here based on their membership in this deputy gang is the first time that LASD has held deputies accountable for deputy gangs causing harm to residents. However, the previous history of LASD and County failure to reign in deputy gangs caused the incident with the Plaintiffs and the harms as a result of the incident. The termination of the individual defendants did not retroactively protect the Plaintiffs from harm.

51. The County's continued inaction, even after it admitted in 2019 that LASD allowed the existence of deputy gangs and that the County must do reform to prevent future harm to deputies and residents – specifically, failure to supervise, investigate and discipline employees in the face of widespread constitutional violations – supports an inference that an unconstitutional custom or practice had been unofficially adopted by the County.

52. Under section 1983 of the United States Code, the County and individual Defendants are liable for subjecting Plaintiffs to conduct that occurred under the color of law, and this conduct deprived them of rights, privileges, or immunities guaranteed under the 4th and 14th Amendments of the Constitution of the United States of America.

53. According to 42 U.S.C. § 1983, Civil action for deprivation of rights: every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory

or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

54. Plaintiffs are members of a protected class, as African American and Latino residents, and LASD's deputy gangs like the Indians are notorious for victimizing African American and Latino residents.

55. On and before February 28, 2022, the present Plaintiffs possessed the rights, guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable seizures and detainment, and excessive force by Deputy Sheriffs acting under the color of law.

56. Defendants ADAM NELSON, SHAWN MERRICK, JUSTIN MASRI, RICHARD MENDOZA and DOEs 1 through 10, inclusive, without just and legal cause physically assaulted the Plaintiffs and punched Plaintiff Stevens in the face and restrained him by force, and thereby caused Plaintiff Stevens the various injuries and damages alleged herein. Defendants also mocked Plaintiffs, and screamed obscenities at them, including racist comments and homosexual slurs. Defendants further got into Plaintiffs' faces, threatening to batter them, with Defendant Merrick swinging a car door several times to violently shake Plaintiffs' car before slamming the car door shut.

57. Plaintiffs had not assaulted said defendants or any other person, was unarmed, compliant and helpless, and the use of force on Plaintiff was unjustified and unreasonable under the circumstances and constituted an excessive use of force.

58. Defendants' actions deprived Plaintiffs of their constitutional rights under the fourth and fourteenth amendments of the constitution by detaining them and violently attacking them. Defendants made Plaintiffs fear for their lives as they terrorized them. Plaintiffs also fear the deputies and subgroup associates will further retaliate against them.

59. Defendants ADAM NELSON, SHAWN MERRICK, JUSTIN MASRI, RICHARD MENDOZA and DOEs 1 through 10, inclusive, acted specifically with the intent to deprive the Plaintiffs of the following rights under the United States Constitution:
a. Freedom from unreasonable searches and unreasonable seizures, in the form of the use of excessive force by Deputy Sheriffs,
b. Freedom from a deprivation of liberty without due process of law; and
c. Freedom from summary punishment.
60. Said Defendants subjected Plaintiffs with a deliberate indifference or a reckless disregard of their rights under the U.S. Constitution.
61. As a direct and proximate result of the aforementioned acts of defendants DOES 1 through 10, inclusive, Plaintiffs suffered serious physical injuries, and/or were physically, psychologically, and emotionally impaired.
62. The aforementioned acts of defendants ADAM NELSON, SHAWN MERRICK, JUSTIN MASRI, RICHARD MENDOZA and DOEs 1 through 10, were willful, wanton, malicious and oppressive thereby justifying the awarding of exemplary and punitive damages as to defendants DOEs 1 through 10, inclusive.
63. At all times mentioned herein each of the individual Los Angeles County, and sheriff's deputies were working as employees, and acting as agents and servants of the Defendant County and the Individual Defendants and the DOE Defendants. The sheriff deputies and the DOE Defendants were acting under the color of law at all times. The deputies were at a work-related event, brandished an LASD handgun to threaten them, and identified themselves as cops. LASD terminated 4 of the deputies and disciplined several others for their conduct representing the department. Further, the defendant deputies are members of a deputy subgroup at LASD and assaulted Plaintiffs in furtherance of the Indians gang. The practices and customs of LASD, encouraging formation and perpetuation of violent deputy subgroups/gangs caused the harm to Plaintiffs.
64. The Defendant County is liable by violating its own policies and establishing a custom and practice of the operation of deputy gangs and in engaging in excessive force against African

American and Latino residents. Even though in this instance LASD terminated several of the Defendants and DOE Defendants for attacking Plaintiffs, it was too late to prevent the assaults on Plaintiffs. LASD have failed to hold deputies accountable for excessive force and to investigate use of excessive force, and the association of the violence to deputy subgroups, and this is what led to the attack on Plaintiffs.

65. The Ninth Circuit has held that in some cases, the plaintiff is entitled to have the jury instructed that evidence of governmental inaction – specifically, failure to investigate and discipline employees in the face of widespread constitutional violations – can support an inference that an unconstitutional custom or practice has been unofficially adopted. (*Hunter v. County of Sacramento* (9th Cir. 2011) 652 F.3d 1225, 1234, fn. 8.) "The [entity] may not be held liable for acts of [employees] unless 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or if the constitutional deprivation was 'visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels.' " (*Redman v. County of San Diego* (9th Cir. 1991) 942 F.2d 1435, 1443-1444. ) • "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." (Bd. of the *County Comm'rs v. Brown* (1997) 520 U.S. 397, 404 [117 S.Ct. 1382, 137 L.Ed.2d 626].) • "The custom or policy must be a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " (*Castro v. County of Los Angeles* (9th Cir. 2016) 833 F.3d 1060, 1075 (en banc).) "While a rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies Monell's policy requirement, a 'policy' within the meaning of § 1983 is not limited to official legislative action. Indeed, a decision properly made by a local governmental entity's authorized decisionmaker - i.e., an official who 'possesses final authority to establish [local government] policy with respect to the

[challenged] action' - may constitute official policy. 'Authority to make municipal policy may be granted directly by legislative enactment or may be delegated by an official who possesses such authority, and of course whether an official had final policymaking authority is a question of state law.' " (*Thompson v. City of Los Angeles* (9th Cir. 1989) 885 F.2d 1439, 1443.) • "[A] plaintiff can show a custom or practice of violating a written policy; otherwise, an entity, no matter how flagrant its actual routine practices, always could avoid liability by pointing to a pristine set of policies." (*Castro*, supra, 833 F.3d at p. 1075 fn. 10.) "Appellants need not show evidence of a policy or deficient training; evidence of an informal practice or custom will suffice." (*Nehad v. Browder* (9th Cir. 2019) 929 F.3d 1125, 1141.) "As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." (*Jett v. Dallas Independent School Dist*. (1989) 491 U.S. 701, 737 [109 S.Ct. 2702, 105 L.Ed.2d 598].) "Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." (*Jett*, supra, 491 U.S. at p. 737.) *Gibson v. County of Washoe* [(9th Cir. 2002) 290 F.3d 1175, 1186] discussed two types of policies: those that result in the municipality itself violating someone's constitutional rights or instructing its employees to do so, and those that result, through omission, in municipal responsibility 'for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation.' We have referred to these two types of policies as policies of action and inaction." (*Tsao v. Desert Palace, Inc.* (9th Cir. 2012) 698 F.3d 1128, 1143.) • "A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations. To establish that there

is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, 'that this policy "amounts to deliberate indifference" to the plaintiff's constitutional right [,]' and that the policy caused the violation, 'in the sense that the [municipality] could have prevented the violation with an appropriate policy.' " (*Tsao*, supra, 698 F.3d at p.1143). • "To show deliberate indifference, [plaintiff] must demonstrate 'that [defendant] was on actual or constructive notice that its omission would likely result in a constitutional violation.' " (*Tsao*, supra, 698 F.3d at p. 1145.) • "[P]laintiff may prove . . . deliberate indifference, through evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations.' Thus, it is sufficient under our case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity." (*Rodriguez v. County of Los Angeles* (9th Cir. 2018) 891 F.3d 776, 803). "Discussing liability of a municipality under the federal Civil Rights Act based on 'custom,' the California Court of Appeal for the Fifth Appellate District recently noted, 'If the plaintiff seeks to show he was injured by governmental "custom," he must show that the governmental entity's "custom" was "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." ' " (*Bach v. County of Butte* (1983) 147 Cal.App.3d 554, 569, fn.11 [195 Cal.Rptr. 268].) The federal courts have recognized that local elected officials and appointed department heads can make official policy or create official custom sufficient to impose liability under section 1983 on their governmental employers." (*Bach*, supra, 147 Cal.App.3d at p. 570.)

66. Sheriff Luna should be commended for LASD terminating some of Defendants. And it is a positive step that the Board of Supervisors continue to call for LASD reforms to eliminate deputy gangs. But the County and its customs and practices are responsible for what happened to Plaintiffs, as the County has only talked of reform since 2019 and continues to only give lip service to ending deputy gangs. The County has intentionally avoided reforming itself and ending deputy gangs and has shown a deliberate indifference to the harms caused

to residents and deputies by deputy gangs such as the Indians, to the degree the State Attorney General had to step in and force reform onto the County.

67. Plaintiffs were mentally, emotionally, and physically abused by Defendants, and continue to suffer from severe stress, PTSD, and trauma.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for Judgment against the Defendant as follows:

1. For special damages, including but not limited to, lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at the time of trial, all in an amount set forth above and/or according to proof at the time of trial;
2. For further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial;
3. For general damages in an amount set forth above and/or according to proof at the time of trial;
4. For interest: Pre-Judgment and Post-Judgment at the maximum legal rate;
5. For costs of suit; and
6. That Plaintiffs be awarded such further legal and equitable relief as the Court deems proper.

Dated this December 17, 2024,   THE LAW OFFICES OF VINCENT MILLER

*Vincent Miller*
_____

VINCENT MILLER, Attorney for Plaintiffs

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated December 17, 2024

THE LAW OFFICES OF VINCENT MILLER

*/s/ Vincent Miller*

VINCENT MILLER, Attorney for Plaintiffs